FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 2:09-849 |
| v. | OPINION |
| TERRENCE MOSLEY, | HON. WILLIAM J. MARTINI |
| Defendant. | |

**WILLIAM J. MARTINI, U.S.D.J.:**

This matter comes before the Court on attorney Michael Baldassare's CJA Form 20 voucher requesting payment in the amount of $99,183.24[1] in connection with his representation of Terrence Mosley ("Defendant") in the above-referenced case. The Court issued Mr. Baldassare an order to show cause why the requested payment is justified. The Court then held a hearing on the issue on April 15, 2011. For the reasons stated below, the Court has reduced the requested compensation from $99,183.24 to $16,150.67.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

On December 12, 2007, a Federal Complaint was first filed against Defendant in

---

[1] While the bill submitted to the Court was for $99,183.24, Mr. Baldassare noted in his accompanying letter that he had "reviewed this bill prior to its submission and reduced it by approximately $26,000." Without this adjustment, his submitted bill would have been approximately $125,183.00.

an earlier case, *United States v. Mosley*, Criminal No. 08-771 (JAG).  On December 19, 2007, attorney Michael Baldassare was appointed to represent Defendant pursuant to the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A.  Defendant was then indicted in this matter on October 15, 2008.  On December 12, 2008, Defendant filed a motion to dismiss the Indictment with prejudice pursuant to the Speedy Trial Act, 18 U.S.C. § 3162, and oral argument was heard on February 9, 2009.  On October 9, 2009, Judge Greenaway dismissed the Indictment without prejudice.

On November 6, 2009, the Government re-indicted Defendant, leading to the instant case.  A grand jury returned a two-count indictment charging Defendant with (1) conspiring to distribute and possess with intent to distribute a controlled substance, and (2) distributing and possessing with intent to distribute a controlled substance.  Defendant was arraigned on December 15, 2009.  Defendant then moved to be released on bail on January 7, 2010, and his motion was denied by Magistrate Judge Salas after a hearing. On February 24, 2010, Defendant entered into a plea agreement with the Government, and pleaded guilty to a one-count superseding information charging Defendant with conspiracy to possess with intent to distribute a quantity of a substance containing cocaine base (i.e., "crack cocaine").  (Docket No. 19.)  On August 5, 2010, the Court sentenced Defendant to 48 months imprisonment and three years of supervised release.

On November 4, 2010, attorney Michael Baldassare submitted a CJA 20 voucher

2

form requesting $99,183.24[2] for legal services rendered and expenses incurred during the three years (December 17, 2007 through September 30, 2010) he represented Defendant. The Court issued an order to show cause as to why a request for $99,183.24 is justified on December 6, 2010. On April 15, 2011, the Court held a hearing on the order to show cause, and during the hearing provided Mr. Baldassare the option to go forward with an additional full evidentiary hearing to address the details of the CJA voucher. Mr. Baldassare declined this option, and the Court indicated its intent to issue an opinion relying on the voucher on its face without requiring substantiation of each entry.

## II.  DISCUSSION

The CJA authorizes the appointment of, and compensation for, counsel to represent indigent defendants charged with federal offenses. 18 U.S.C. § 3006A. Attorneys are paid in accordance with the Act both for hours spent before the court and those "reasonably expended out of court." 18 U.S.C. § 3006A(d)(1). However, it is the duty of the Court to determine what is a reasonable expense or a reasonable use of billable time, and to determine exactly what compensation and reimbursement will be paid. 18 U.S.C. § 3006A(d)(5); *United States v. Smith*, 76 F. Supp.2d 767, 768 (S.D. Tex. 1999). Courts cannot simply rubber-stamp every CJA voucher that crosses their paths. Every time an attorney submits such a voucher, that attorney is asking the U.S. Treasury

---

[2] As stated previously, the letter Mr. Baldassare submitted with his voucher indicated that he had already reduced the amount by $26,000, meaning that his original requested amount would have been over $125,000.

to dole out a portion of its limited resources. *Smith,* 76 F. Supp. 2d at 768. It is the role of the Court to scrutinize these requests to properly safeguard precious taxpayer funds, or else there is little to prevent taxpayer money from being wasted on unreasonable or unnecessary activities by court appointed defense counsel. *Id.*

To guide attorneys in submitting CJA forms and to guide Courts in evaluating those forms, the Judicial Conference of the United States has approved official guidelines addressing the CJA program, set forth in the Guide to Judiciary Policy, Volume 7, Part A ("Guidelines"). First, the Guidelines institute case compensation maximums, which set the maximum compensation attorneys should request for particular types of cases. Guidelines, § 230.23.20. Under the Guidelines, the case compensation maximum for a case such as this one (involving a defendant accused of a felony at the trial court level) is $9,700 as of January 1, 2010.[3] *Id.* The Guidelines also provide a procedure for waiving the case compensation maximums, stating that "[p]ayments in excess of CJA compensation maximums may be made to provide fair compensation in cases involving extended **or** complex representation when so certified by the court." Guidelines, §230.23.40(a) (emphasis in original). Approval for a voucher for excess compensation is a two-step process: first, the Court must determine that the attorney's representation was

---

[3] The Court notes that since Mr. Baldassare's representation of Defendant began in December 2007, the case compensation maximum at that time was $7,000 and has been raised three times since then to reach $9,700. However, since the fees requested are drastically higher than any of these case compensation maximums, the Court will utilize the most recent and highest maximum to simplify the analysis.

either extended or complex, and second, the Court must determine what amount of excess payment is necessary to provide fair compensation. Guidelines, §230.23.40.

The Court is supposed to be limited by this two-step process to grant excess compensation only in cases that are out of the ordinary, and such excess compensation was meant to be the exception, not the rule. *See United States v. Holtz,* 379 F. Supp. 2d 988, 992 (C.D. Ill. 2005) (noting that many attorneys "wrongfully expect the Court to approve their fee petitions regardless of the CJA maximum"). However, the analysis is often not so rigid, and fees over the case compensation maximum are routinely reviewed and approved by this Court and its colleagues without formal inquiry. Such formality is often not necessary, as most attorneys who have accepted CJA appointments have recognized this limit and request excess compensation sparingly and only when necessary. As the Court has observed over the years, most CJA attorneys perform admirably, and submit vouchers that are reasonable and appropriate. Indeed, only once before did this Court raise question over a voucher, and the issue was easily resolved with a small adjustment in the amount of compensation. The Court's choice to conduct a more formal analysis in this case is in response to what this Court believes to be an exorbitant fee.

A. **Whether the Case is "Extended" or "Complex"**

A case is considered "complex" if the legal or factual issues in the case are unusual, requiring the expenditure of more time, skill, and effort than would normally be

5

required.  Guidelines, §230.23.40(b).  A case is considered "extended" if the case reasonably requires more time than usual, including pre-trial and post-trial hearings.  *Id.*  Here, Mr. Baldassare argues that this case was both extended and complex.  First, he points out that his representation of Defendant, Mr. Mosley, began in December 2007 and continued through September 2010.  However, the mere passage of time is not the criteria for determining whether a case is "extended."  Here, almost a year of Mr. Baldassare's representation of Defendant consisted of waiting for a ruling on the motion to dismiss the Indictment.  Therefore, while three years may have passed, the case itself did not require more of Mr. Baladassare's time than a usual criminal case.

      The Court also disagrees with Mr. Baldassare's description of this case as "complex."  While Mr. Baldassare points to aspects of the case such as the motion to dismiss pursuant to the Speedy Trial Act, which required briefing as well as a hearing, this is certainly not a unique issue for a criminal defendant.  The Court has reviewed the brief and the motion to dismiss opinion, and did not find any unusual or out of the ordinary arguments.  Additionally, Mr. Baldassare's claim that preparing the Sentencing Memorandum required more work than usual, as it provided an analysis of the career offender guidelines and the crack cocaine sentencing guidelines, also fails to justify dubbing this case as particularly "complex."  *See, e.g., United States v. Sepulveda*, 502 F. Supp. 2d 1104, 1109 (D. Mont. 2007) ("Disputes over whether a prior conviction should count toward a defendant's criminal history are routine, and do not support a finding of

6

complexity.") Issues with the guidelines for career offenders and crack cocaine crimes are common pre-sentencing topics that the Court has seen presented in other cases numerous times. In essentially every case dealing with either crack cocaine crimes or defendants with higher criminal history levels, counsel is likely to raise objections in their sentencing memorandums to the crack cocaine guidelines[4] or the career offender guidelines. Finally, the Court notes that while Mr. Baldassare pointed to the several large volumes that were submitted as exhibits in support of the Sentencing Memorandum, most of these exhibits were unnecessary photocopies of large sections of the Federal Sentencing Guidelines and related materials. Simply because a submission includes a large number of pages does not make it complex, nor does it demonstrate an exercise of professional judgment. There is nothing "complex" about providing the Court with photocopies of extensive portions of materials which the Court is quite familiar with and uses on a regular basis.

### B. Determining "Fair Compensation"

Nevertheless, the Court finds that this case does qualify for some excess compensation. While finding that excess compensation beyond the $9,700 case compensation maximum is appropriate, this does not end the Court's inquiry. The second

---

[4] Even lawmakers eventually addressed such objections to the crack cocaine guidelines, promulgating the Fair Sentencing Act, Pub. L. No. 111-220, which was signed into law by the president on August 3, 2010. The Fair Sentencing Act reduced the statutory penalties for crack cocaine trafficking and eliminated the mandatory minimum sentence for simple possession of crack cocaine.

7

prong requires the Court to determine what amount of excess fees will provide "fair compensation." Guidelines, §230.23.40(c).

Mr. Baldassare is requesting $79,445.80 in attorneys' fees, as well as $19,737.42 in expenses,[5] as compensation for his services rendered as a court-appointed attorney in a one defendant case that did not go to trial and ended in a guilty plea. When the Court received the CJA Form 20 Voucher with this request, the first reaction was shock. Mr. Baldassare's request is more than eight times the case compensation maximum, without any extraordinary reason, in a case ending in a guilty plea without trial. Therefore, the Court inquired into the average, as well as highest and lowest, CJA attorney payments over the last five years in felony drug representations ending in a guilty plea with no trial time.[6] The lowest five CJA payments, *including* expenses as well as attorneys' fees, ranged from approximately $1,350 to $1,900. The average CJA payment for this type of representation was $8,548; meaning that on average, court-appointed attorneys were able to represent their clients in these types of proceedings without requiring excess compensation beyond the maximum. Finally, the highest five payments of fees and expenses, with the exception of one payment of approximately $63,000 (still approximately $36,000 less than what Mr. Baldassare is requesting), ranged from

---

[5] The case compensation maximums deal only with attorneys' fees. Reimbursable expenses are addressed in §§ 230.63, 230.66. Therefore, the Court will analyze Mr. Baldassare's requested expenses separately below.

[6] The Court enlisted the help of Bill Holland, Director of Court Services, in collecting this data.

approximately $26,000 to $35,000.[7]  Essentially, the highest CJA payments authorized in this type of case have been about a third of what Mr. Baldassare is requesting.

Upon this discovery, the Court inquired further to determine how much Mr. Baldassare had requested in past CJA vouchers submitted to the District of New Jersey.[8] That inquiry revealed that the totals for fees and expenses in the eight CJA vouchers Mr. Baldassare has submitted over the last five years ranged from $13,224.72, for a simple matter ending in dismissal in front of a Magistrate Judge, to $160,003.14 for a ten-day trial.  Not once has Mr. Baldassare managed to stay within the case compensation maximum.  The total in fees and expenses that Mr. Baldassare has requested from the U.S. Treasury over the last five years, not including the current request in front of this court, is $638,083.46.

This Court is obviously not in the position to evaluate whether the amounts claimed in these other CJA vouchers constituted "fair compensation."  However, fee requests that appear higher than usual often are given the benefit of the doubt when viewed in a vacuum, and it is only when all the bills are analyzed at once that a pattern of high billing is revealed.  *See, e.g., United States v. Sepulveda*, 502 F. Supp. 2d 1104, 1110

---

[7] The highest five CJA payments in this District over last five years, including expenses, were as follows: $62,955.10, $34,689.41, $29,566.21, $26,942.75, and $26,307.28.

[8] While only the CJA voucher in this case is at issue, the Court felt it necessary to review Mr. Baldassare's billing history to see whether there has been a pattern of vouchers exceeding the case compensation maximum.  *See, e.g.*, *United States v. Sepulveda*, 502 F. Supp. 2d 1104, 1106 (D. Mont. 2007) (reviewing the attorney's past three years of CJA billing and finding it "reveal[ed] a troubling pattern of excess").

(D. Mont. 2007) ("a pattern can emerge tending to show that an attorney regularly exceeds the limits of necessity"). Incidentally, some of Mr. Baldassare's submissions have indeed aroused concern in the past. For example, one District Court Judge, upon receiving a voucher, wrote back to the In-Court Supervisor who oversees the CJA vouchers, stating, "why are other [attorneys] billing??"[9] In response to another CJA voucher, the In-Court Supervisor included the following caveat in the memo relaying the voucher to the reviewing Judge: "I attached a copy of the vouchers submitted by counsel for co-defendants. Those vouchers are considerably smaller than the one submitted by Mr. Baldassare. I supply these vouchers merely as a guide because the circumstances between the defendants may be completely different." This last comment, it should be noted, was in reference to a request by Mr. Baldassare for $62,043.27 in fees and expenses for services rendered in another case ending in a guilty plea with no trial.

This analysis of other fee requests should put into context the Court's concern over approving this CJA voucher for an amount that is grossly out of line with similar requests in this district. As the Ninth Circuit has explained, the purpose of the CJA is not to help attorneys profit, but to provide indigent defendants with adequate representation in the Federal courts, and to provide "reasonable compensation to counsel who are assigned." *In re Smith*, 586 F.3d 1169, 1175 (9th Cir. 2009) (quoting S. Rep. No. 88-346, at 1 (1963)); *see also United States v. Stout,* 109 F. Supp.2d 982, 984 (C.D. Ill. 2000) (counsel

---

[9] The issue of attorneys other than the court-appointed attorney including their hours in the CJA voucher will be discussed in more detail below.

entitled to be paid "only for hours that are necessary for reasonably diligent, conscientious, and competent representation"); *United States v. Jewett*, 625 F. Supp. 498, 500 (W.D. Mo. 1985) ("Congress has always made clear that it intended that 'fair compensation,' rather than 'full compensation,' for appointed counsel was contemplated by the Criminal Justice Act."). Congress's purpose behind instituting CJA compensation was to "ease the financial burden" associated with providing these services which had been traditionally provided pro bono. *United States v. Diaz*, 802 F. Supp. 304, 307 (C.D. Cal. 1992). As best put by the Court in *Diaz,* "[t]he spirit of the statute is lost once the CJA representation of indigent defendants loses its essentially pro bono nature." *Id.* The issue at hand is simply what level of compensation is a reasonable and fair amount for the U.S. Treasury to spend on this type of case. *See In re Smith*, 586 F.3d at 1175 ("The question thus becomes not what hours were *actually* expended, but what hours were *reasonably* expended completing work necessary for adequate representation." (internal quotation omitted)).

Finally, it should be noted that without a full evidentiary hearing, the option of which was offered to and declined by Mr. Baldassare during the April 15, 2011 hearing, the Court is limited in its findings to determining a reasonable and necessary amount to provide fair compensation. The Court cannot make a final determination as to what hours were actually expended, nor as to whether there has been any purposeful overstatement of fees.

11

**1.     Billing for Multiple Attorneys**

This first issue the Court has with Mr. Baldassare's voucher is an issue that likely needs to be clarified for all court-appointed attorneys. The CJA system is designed for indigent defendants to be represented by a single attorney. The framework at a large law firm, however, is designed around teams of multiple attorneys working together on each matter. The Guidelines address this issue, stating that while co-counsel or associate attorneys normally "may not be compensated under the CJA" unless separately appointed by the Court, "an appointed counsel *may* claim compensation for services furnished by a partner or associate . . . *within* the maximum compensation allowed by the CJA." Guidelines, §§ 230.53.10, 230.53.20 (emphasis added). In his letter to the Court dated December 13, 2010, Mr. Baldassare mistakenly interprets this provision to mean that each associate or partner he chooses to work on this case can separately bill for the full case maximum. (December 13 Letter, at 2.) Logically, this interpretation is untenable, as it would mean that any court-appointed attorney could assign as many associates on a matter as he or she chooses, and then bill the case compensation maximum for each one without end. The correct interpretation of this provision is that it only allows a court-appointed attorney to share the work with other partners or associates in his or her firm so long as the *total* compensation requested is within the statutory maximum. This meaning is clear when the provision is read in conjunction with an earlier provision in the Guidelines, which states that case compensation maximums may apply "separately to

each attorney" only in "difficult cases in which the court finds it necessary to appoint more than one attorney."  Guidelines, § 230.23.10(f).  Therefore, unless otherwise authorized by the Court, any CJA vouchers requesting a fee over the case compensation maximum should reflect *only* the hours billed by the court-appointed attorney.[10]

Such strict adherence to the Guidelines is not always required by courts, and the Court is mindful that CJA fees have been paid to multiple attorneys without pre-authorization in the past in this District.  However, the better practice is to adhere to the Guidelines and request authorization before billing on behalf of fellow attorneys.  Furthermore, such CJA vouchers authorized in the past likely did not request such large fees, and therefore did not raise concerns as the instant voucher did.

The CJA voucher submitted by Mr. Baldassare includes hours billed by no less than eight fellow Gibbons P.C. attorneys.  One associate in particular, Ms. Costello, billed more hours than Mr. Baldassare himself.  The Court never authorized the appointment of any additional attorneys in this case, nor would it have.  As such, while Mr. Baldassare and other court-appointed attorneys are free to seek the help of associates and other partners in their law firms, the work of these additional attorneys should be done on a pro

---

[10] This provision only restricts the number of attorneys that may bill the government on the matter; other partners and associates are free to work on a CJA matter pro bono.  Again, this goes back to the purpose behind the CJA, which was always pro bono in nature.  *See United States v. Carnevale,* 624 F. Supp. 381, 384 (D.R.I. 1985) ("A substantial element of appointed counsel's representation under the [CJA] remains public service[.]" (quoting *United States v. Hildebrandt,* 420 F. Supp. 476, 478 (S.D.N.Y. 1975)).

bono basis unless expressly authorized by the Court.[11] The Court will not authorize payment for any hours billed by attorneys other than Mr. Baldassare, which reduces the potential attorneys' fees from $79,445.80 (for 727.7 hours) to $31,984.10 (for 278.3 hours billed by Mr. Baldassare himself).

### 2. Application of the "Fair Compensation" Criteria

To aid courts in determining whether the CJA fee requested is "necessary to provide fair compensation," the Guidelines point to the following criteria:

> (1) responsibilities involved measured by the magnitude and importance of the case;
>
> (2) manner in which duties were performed;
>
> (3) knowledge, skill, efficiency, professionalism, and judgment required of and used by counsel;
>
> (4) nature of counsel's practice and injury thereto;
>
> (5) any extraordinary pressure of time or other factors under which services were rendered; and
>
> (6) any other circumstances relevant and material to a determination of a fair and reasonable fee.

Guidelines, §230.23.40(c). *See also United States v. Johnson,* 214 F. Supp. 2d 488, 491 (E.D.Pa. 2002).

---

[11] Unless, of course, the entire fee requested falls below the case compensation maximum, in which case the time billed by other associates and partners may be included.

Applying these factors to the case at hand, only the first factor arguably supports a larger fee. Defending a client against a claim with a high mandatory sentencing minimum, such as in a crack cocaine case like this one, is a heavy responsibility – but is one that is undertaken frequently by CJA appointees. However, that does not mean that attorney "has carte blanche to request whatever fees he or she wants[.]" *Jackson v. United States*, Civ. No. 09-1039, 2010 U.S. Dist. LEXIS 105447, at *9 (E.D. Tex. Oct. 1, 2010).

The other criteria do not provide support for the high fee Mr. Baldassare is requesting. The second factor, manner in which duties were performed, has already been taken into account by the discussion above regarding multiple attorneys. The Court has already determined that duties performed by counsel other than Mr. Baldassare will not be paid for by the CJA program. The third factor, relating to Mr. Baldassare's abilities, further requires that the Court keep the excess compensation to a minimum. Mr. Baldassare is a knowledgeable and experienced criminal defense attorney, having practiced in the field for over a decade. His extensive experience should have "reduce[d] the need for legal research on basic issues." *Jackson*, 201 U.S. Dist. LEXIS 105447, at *10. As for the fourth and fifth factors, the Court does not see how counsel's practice could have been injured by his representing Mr. Mosley in this case, and the Court does not see any extraordinary time constraints present. Finally, the other relevant circumstances material to determining a fair and reasonable fee are the plea negotiations

with the government that Mr. Baldassare points to as one of the reasons that the CJA voucher is so high. It is true that it appears the plea negotiations with the government in this case may have required more time than usual, and that would justify some level of excess compensation. While the Court recognizes that the additional plea negotiations may justify a departure from the statutory maximum, it does not mean that the full amount requested by Mr. Baldassare is reasonable and necessary to provide fair compensation.

All in all, while a fee over the case compensation maximum may be reasonable in this case, there is no justification for a large departure anywhere near the amount requested. Without a detailed inquiry and full evidentiary hearing, however, the Court can only be guided by the Court's own research into average CJA fees granted in similar cases. As stated previously, the average CJA payment for this type of representation in this District is $8,548. Using this average as a benchmark, and increasing the fee from this average to take into account the plea negotiations with the government addressed above, the Court finds that $13,500 represents what is necessary and reasonable to provide "fair compensation" in this case.

### C. Expenses

In addition to the $79,445.80 in attorneys' fees, Mr. Baldassare is also requesting reimbursement for $19,737.42 in expenses, another highly questionable submission. As explained above, allowable expenses are addressed separately in sections 230.63 and 230.66 of the Guidelines. Unlike for attorneys' fees, there is no limitation on the amount

of expenses that may be reimbursed.  Guidelines, § 230.23.40(d).  Instead, any "[o]ut-of-pocket expenses *reasonably incurred* may be claimed on the voucher[.]" Guidelines, § 230.63.10 (emphasis added).  The Guidelines do restrict reimbursements to specific categories of expenses.  Acceptable categories include: (1) travel expenses, § 230.63.40; (2) transcripts, § 230.63.20; (3) computer-assisted research, but only if "the amount claimed is reasonable,"[12] § 230.63.30; and (4) telephone toll calls, telegraphs, photographs and copying, § 230.63.70.  Other expenses are specifically excluded by the Guidelines, such as printing (§ 230.66.40) and general office overhead (§ 230.66.10).

As with his requests for attorney compensation, Mr. Baldassare has a history of requesting high amounts for expenses in this District.  The amount of expenses claimed here, $19,737.42, is excessive for a case like this one.  Over the eight CJA vouchers submitted by Mr. Baldassare to this district over the past five years, the amount of expenses claimed range from $636.40 to $37,074.34.  In total, Mr. Baldassare has received $119,130.33 in reimbursed expenses over his last eight CJA appointments.  This averages out to over $10,000 in expenses per case, which yet again shows a pattern of requesting excessive amounts.

Looking to his current request for $19,737.42 in expenses, it is the Court's duty to provide reimbursement, but only for the expenses that are "reasonably incurred."

---

[12] Additionally, if the amount claimed is over $500 or includes the cost of downloading or printing, a statement of justification should be included with the reimbursement request.  Guidelines, § 230.63.30.

Guidelines, § 230.63.10.  Here, certain categories of entries appear to this court to be unreasonable.  First, the Court finds that the amount listed for copying expenses, $2,958.60, is unreasonable.  Most of these costs come from the choice by Mr. Baldassare to photocopy copious amounts of the Federal Sentencing Guidelines and related materials and include such "exhibits" with his submissions to the Court, as well as his choice to make most copies in color (at $1.00/page).  Another unreasonable expense is the sheer amount of computer-assisted research that is charged here.  As the Guidelines explain, while computer-assisted research is reimbursable, it must be reasonable.  Guidelines, § 230.63.30.  Additionally, if the amount claimed is over $500 or includes the cost of downloading or printing, a statement of justification should be included with the reimbursement request.  *Id.*  The majority of the expenses claimed by Mr. Baldassare are computer-assisted research costs.  Additionally, most of the research costs were incurred by Mr. Baldassare's fellow attorneys and not Mr. Baldassare himself.  Some of these costs are not even research-based, but are costs for printing or retrieving a document.  The nature of the case, the charge, the legal issues and motions were not so novel as to justify such extensive legal research expenses.

     The Court will reimburse Mr. Baldassare a total of $2,650.67 for what it finds to be reasonable, allowable expenses.  Specifically, this represents $100.00 for reasonable copying expenses; $2,000.00 for reasonable computer legal research expenses; $381.82 in travel and parking expenses; and $168.85 for expenses incurred delivering and mailing

materials to the Court.

### D. Ethical Issues

Finally, the Court will take a moment to address the ethical implications, beyond the CJA program, of submitting excessive CJA vouchers to the Court. Not only are court-appointed attorneys bound by the CJA guidelines, but as New Jersey attorneys they are also bound by the State of New Jersey's Rules of Professional Conduct ("RPC").[13] Under New Jersey's rules, an attorney's fee must be "reasonable." RPC 1.5. A finding that an attorney has violated RPC 1.5 by charging a fee that is not reasonable could result in disbarment, suspension, reprimands, or other disciplinary action in this district. L. Civ. R. 104.1(d). Mr. Baldassare as a CJA-appointed attorney must be aware of these rules and understand the dire consequences that can result from submitting a sworn unreasonable fee request of the U.S. Treasury, just as such consequences can follow from charging private clients exorbitant fees. Because, as previously stated, Mr. Baldassare opted not to have a full evidentiary hearing, and instead allowed the Court to rely on the face of the voucher, the Court is not in a position to make any findings of professional conduct rule violations at this time.

Finally, and on a related note, the Court cautions all law firms but especially larger ones to be diligent in overseeing all CJA vouchers that are submitted by their attorneys. These fee requests must be taken as seriously as bills sent to paying clients, and it is

---

[13] New Jersey's Rules of Professional Conduct apply to attorneys admitted to the District of New Jersey. L. Civ. R. 103.1.

incumbent upon law firms to provide the level of oversight needed to prevent individual attorneys from gaming the system. While the ultimate responsibility is on the Courts to diligently review the CJA vouchers and determine the appropriate attorneys' fees and expenses to award, more extensive oversight on the law firm end could prevent embarrassment and excessive requests for payments in the future.[14]

### III.   CONCLUSION

For the reasons stated above, the Court authorizes $13,500 in attorneys' fees and $2,650.67 in expenses to be paid to Gibbons P.C. for Michael Baldassare's services as court-appointed counsel for Defendant Terrence Mosley. An appropriate Order accompanies this Opinion.

    s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: April 27, 2011**

---

[14] The Court is aware that in the instant case, Mr. Baldassare was a partner at Gibbons during his representation of Defendant Terrence Mosley and at the time the voucher was submitted. As such, the Court is not casting any blame on the firm, understanding that Gibbons, as any law firm would, entrusted Mr. Baldassare as a partner to submit appropriate billing without oversight.